IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2020[1]

## IN RE NOAH A.

**Appeal from the Juvenile Court for Loudon County**
**No. 2019-JV-138          Henry E. Sledge, Judge**

_____

**No. E2019-01633-COA-R3-PT**

_____

This action involves the termination of both parents' rights to a minor child. Following a trial, the Loudon County Juvenile Court found that clear and convincing evidence existed to support five statutory grounds for termination of both parents' rights: (1) abandonment by failure to establish a suitable home; (2) abandonment by an incarcerated parent; (3) substantial non-compliance with the permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability and a willingness to assume custody. The court also found that termination was in the best interest of the child. Both parents appealed. We vacate in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in part, Affirmed in part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Matthew R. Knable, Lenoir City, Tennessee, for the appellant, Kevin M.

Mark Pienkowski, Knoxville, Tennessee, for the appellant, Amanda A.

Herbert H. Slatery, III, Attorney General and Reporter, and Stephanie R. Reevers, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

Amanda A. ("Mother") and Kevin M. ("Father") (collectively "Parents") are the

_____
[1] This case was assigned to the authoring judge on September 15, 2020.

parents of Noah A., who was born in December 2014.[2]  On February 23, 2018, the Tennessee Department of Children's Services ("DCS") received a referral alleging that Noah was drug exposed.  The referral occurred after Mother was arrested for driving under the influence.  Father and Noah were in the car that Mother was driving at the time of the incident.  Mother admitted to DCS that she took a Percocet without a prescription prior to her arrest, and Father admitted that he had a history of substance abuse, but denied that he was still using drugs.  The child was not removed from the home at that time, but Mother and Father agreed to complete alcohol and drug assessments and to follow all recommendations.

On April 2, 2018, Mother consented to a drug test and tested positive for buprenorphine, methamphetamine, and opiates.  Father refused to consent to a drug screen and later admitted that he would have tested positive for buprenorphine, methamphetamine, and opiates.  He stated that he was also using marijuana.  That same day, DCS held a Child and Family Team Meeting ("CFTM") with Parents.  At the meeting, Parents stated that they had not completed an alcohol and drug assessment as they previously agreed.  At the time, Parents and Noah resided with the paternal grandparents.  Father stated that, while at home, he and Mother would go outside the house to use drugs while Noah's paternal grandmother would care for him.  Upon returning indoors, Parents cared for Noah while under the influence.

DCS filed a petition in the Loudon County Juvenile Court on April 13, 2018 alleging that Noah was dependent and neglected based on Parents' drug use.  The petition requested that Parents have only supervised visitation and be required to comply with a non-custodial permanency plan.  On April 16, 2018, the juvenile court entered an order that placed Noah in the protective custody of the court.  In the order, the court found there was probable cause to show that Noah was dependent and neglected and required Parents to comply with the requirements in their non-custodial permanency plans.  The order stated that Mother, Father, and Noah were to remain in the paternal grandparents' home while Parents complied with services through DCS.  However, the order permitted Parents to have "loosely supervised contact" with Noah, allowing Parents and Noah to remain in the paternal grandparents' home.

Among other things, the non-custodial permanency plan stated that Parents were required to submit to a mental health assessment and to random drug screening, complete a drug and alcohol assessment, follow the recommendations of the assessments, attend family and individual counseling, attend parenting classes, cooperate with DCS and other service providers, and comply with any court order.  Later, Parents waived a preliminary hearing on the dependency and neglect petition and agreed to comply with services through DCS.  On April 24, 2018, the trial court entered a preliminary hearing order that restated

---

[2] In cases involving minors, this Court has a policy of protecting the identity of children by initializing the last names of the parties.  *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

many of the requirements and visitation guidelines that were in its previous order.

On September 19, 2018, Noah's guardian ad litem filed an emergency petition to remove Noah from the home. In the emergency petition, the guardian ad litem alleged that Parents continued to illegally consume prescription drugs. The petition also stated that the guardian ad litem was concerned with the safety, environment, and hygiene of the home. Although it was the grandparents' home, the petition stated that Parents lived in the home and slept in the same room as Noah. On the same day the petition was filed, the juvenile court entered an emergency order that placed Noah in the custody of DCS. Noah was placed in a foster home on September 19, 2018, and he has remained in that home.

On September 25, 2018, Parents waived the preliminary hearing on the emergency petition, and the juvenile court continued DCS's temporary legal custody of Noah. The court allowed Parents to have supervised visitation at the discretion of DCS and ensured Parents were aware of their continuing duty to provide child support. A subsequent adjudicatory order reaffirmed the court's ruling and stated that Parents stipulated to their substance abuse at the time the emergency petition was filed. The next day, another CFTM was held with Parents and Kara Clare, a caseworker with DCS. At the meeting, the parties discussed the reasons for Noah's removal and expectations for Parents' completion of a permanency plan moving forward. A visitation schedule with Noah was also established.

A custodial permanency plan was created on October 5, 2018. The custodial permanency plan was developed by DCS with Parents' participation. The permanency plan required Parents to complete an alcohol and drug assessment and follow all recommendations, submit to random drug screens, complete a mental health assessment and follow all recommendations, obtain and maintain housing for at least three months, obtain and maintain a stable legal income to care of Noah's basic needs, continue parenting education and follow any recommendations, submit a transportation plan, comply with all rules of probation and provide contact information for the probation officer, and incur no new legal charges. The plan also provided for two-hour visitation periods with Noah twice per month. The goals of the plan were for Noah to return to Parents' custody or exit foster care with another relative. On October 23, 2018, the trial court ratified the plan and found its requirements to be reasonable and related to remedying the conditions that led to Noah entering foster care.

At an adjudicatory hearing on October 23, 2018, Parents stipulated to their substance abuse at the time the petition was filed. As a result, the court found that Noah was dependent and neglected pursuant to Tennessee Code Annotated section 37-1-114(2).

According to Ms. Clare, DCS scheduled appointments with WestCare[3] for Parents to complete mental health and alcohol and drug assessments. DCS also arranged

---

[3] This organization is sometimes referred to as "Wescare" in the record before us.

transportation for Parents through East Tennessee Human Resources Agency. Parents did not attend their original appointments, and they did not attend their rescheduled appointments in October 2018. DCS then scheduled services with a different mental health provider, Health Connect, on December 14, 2018. Despite these efforts by DCS, Parents did not attend that appointment either. After Parents moved out of the paternal grandparents' home in December 2018, DCS was unable to contact Parents from December 3, 2018, until January 23, 2019. Father testified that he stopped working with DCS in December because he believed Noah would be placed with Noah's paternal uncle.[4]

By January 23, 2019, after Noah had been in DCS custody for four months, neither Mother nor Father had completed an alcohol and drug or a mental health assessment, parenting classes, or a transportation plan. Despite Ms. Clare's efforts to schedule a drug screen, Parents had not been screened since Noah was taken into custody. Parents' first drug screen after Noah was removed from their custody was on February 21, 2019. Mother tested positive for Suboxone. Father was unable to complete a urine screen but admitted to having used Suboxone several days earlier. Neither parent had a prescription for Suboxone.

Parents visited Noah once in September 2018, once in October 2018, and twice in November 2018. Parents missed both visits scheduled in December 2018 and January 2019. Parents visited Noah once in February 2019. In total, Parents attended four of the seven scheduled visitations in the first four months Noah was in DCS custody. On March 9, 2019, Parents turned themselves in for probation violations and were incarcerated and unable to visit during the month of March. Parents were released from jail at the beginning of April 2019.

On March 22, 2019, while Parents were incarcerated, another permanency plan was developed. The new plan contained the same requirements as the prior plan. The trial court ratified the plan on May 7, 2019.

On April 2, 2019, DCS initiated the instant matter by filing a petition to terminate Parents' rights to Noah. In its petition, DCS alleged five grounds for termination: (1) abandonment by failure to establish a suitable home; (2) abandonment by an incarcerated parent; (3) substantial noncompliance with the permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability and a willingness to assume custody. DCS also alleged that termination of Parents' rights was in Noah's best interest.

By the time the petition was filed, Father had completed his alcohol and drug and mental health assessments while he was incarcerated. However, he did not complete the intensive outpatient program ("IOP") that was recommended as part of his assessments.

---

[4] Ms. Clare testified that DCS was prepared to release Noah to the custody of the uncle and his wife, but the uncle later decided that he did not want custody of Noah.

Father stated that he began the IOP in May 2019 and had completed "five or six" of twenty-five classes.

At the time the petition was filed, Mother had not completed either an alcohol and drug or mental health assessment. Following her release from jail and the filing of the petition, Mother completed mental health and alcohol and drug assessments, which resulted in a recommendation for intensive outpatient treatment and medication management. Mother did not enroll in intensive outpatient treatment until June 24, 2019.

At the time the termination petition was filed, neither Mother nor Father had paid any child support since Noah left their custody, and they had not secured suitable housing. Parents moved in with Noah's maternal grandmother after they were released from jail in April 2019.

On May 3, 2019, Ms. Clare asked Parents to complete a drug screen, but they refused. She made another request for completion of a test on May 7. The drug screen on May 7 resulted in Mother testing positive for Suboxone. Father was unable to complete a urine screen but admitted to recently using Suboxone. On June 28, 2019, Mother and Father tested positive for Suboxone without a prescription.

The Loudon County Juvenile Court heard the subject petition on July 11, 2019. Ms. Clare, Father, and Noah's paternal grandmother testified.[5] At the time of trial, Parents were still living with the maternal grandparents, who were planning to move to another county. Father admitted that Parents would have no place to live after the grandparents' planned move.

On August 12, 2019, the trial court entered its final written order. In the order, the court found that DCS proved all five grounds for termination against both parents by clear and convincing evidence. The court also found that it was in the best interest of Noah to terminate Parents' rights. As a result, the court terminated Parents' rights to Noah. Parents separately appeal.

## II.    STANDARD OF REVIEW IN TERMINATION CASES

Previously, the Tennessee Supreme Court has described the gravity of proceedings that involve the potential termination of parental rights:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. But parental rights, although fundamental and constitutionally protected, are not absolute. . . .

---

[5] Mother was present and represented by counsel but did not testify.

When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. Few consequences of judicial action are so grave as the severance of natural family ties. The parental rights at stake are far more precious than any property right. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child. In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures in termination proceedings.

*In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (footnote omitted) (citations omitted) (quotation marks omitted).

One of the protections afforded to parents in termination actions is the requirement that the petitioner prove the elements by clear and convincing evidence. *Id.* at 522; *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). This heightened standard of proof "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights." *In re Carrington H.*, 483 S.W.3d at 522. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citation omitted). It must also "eliminate[ ] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

In regard to this Court's role in cases involving the termination of parental rights, our Supreme Court has explained:

Under [Tennessee Rule of Appellate Procedure] Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). . . . The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Carrington H.*, 483 S.W.3d at 524.

### III. ISSUES PRESENTED

Although stated slightly differently by each party, the issues on appeal can be summarized as the following:

1. Whether the trial court erred in finding there was clear and convincing evidence of grounds for the termination of Parents' parental rights; and

2. Whether the trial court erred in finding it was in the best interest of Noah to terminate Parents' parental rights.

For the reasons stated herein, we vacate in part, affirm in part, and remand.

### IV. ANALYSIS

#### A. *Grounds for Termination*

Regardless of whether a parent challenges a particular ground for termination of parental rights, we must review each ground for termination. *In re Carrington H.*, 483 S.W.3d at 525-26; *In re Tamera W.*, 515 S.W.3d 860, 873 (Tenn. Ct. App. 2016); *In re Navada N.*, 498 S.W.3d 579, 589-90 (Tenn. Ct. App. 2016). In this case, the trial court found that all five grounds alleged by DCS were proven against Parents. Therefore, we shall review each ground in turn.

#### 1. Abandonment by Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) states that abandonment, as defined in section 36-1-102, is a ground for termination. *In re Adoption of Angela E.*, 402 S.W.3d at 640. Under section 36-1-102(1)(A)(ii), abandonment can occur when a parent fails to obtain and sustain a suitable home for the child after "[t]he child has been removed from the home or the physical or legal custody of a parent." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a) (2019). To terminate parental rights under this definition of abandonment, the parent must have "failed to provide a suitable home . . . even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)).

DCS assists a parent by making "reasonable efforts" in utilizing its superior resources and training to help find a suitable home. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016); *In re Jamel H.*, 2015 WL 4197220, at *6. "Reasonable efforts entail more than simply providing parents

with a list of service providers and sending them on their way." *In re Matthew T.*, 2016 WL 1621076, at *7 (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008)). DCS makes "reasonable efforts" when its efforts are equal to or greater than that of the parent. Tenn. Code Ann § 36-1-102(1)(A)(ii)(c) (2019). In order for this ground to be proven, DCS must have made "reasonable efforts" for a four-month period after the child was removed from the parent's custody. *See In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016); *In re Matthew T.*, 2016 WL 1621076, at *7. As for the parent's efforts, the parent must do more than provide adequate space for the child. *Id.*; *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A suitable home includes adequate care and attention being given to the child. *In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at *7 (Tenn. Ct. App. Sept. 27, 2017); *In re Matthew T.*, 2016 WL 1621076, at *7.

In the present case, Parents argue that the evidence was insufficient to support this ground for two reasons: (1) the trial court did not enter an order removing Noah from the home or physical or legal custody of Parents, as required by statute, and (2) the efforts made by DCS to aid in establishing a suitable home were not reasonable because Parents' efforts to establish a suitable home exceeded DCS's efforts. We will consider each argument in turn.

Parents argue that the trial court did not enter an order removing Noah from the home or physical or legal custody of the parents or a guardian, as required by section 36-1-102(1)(A)(ii)(a). The juvenile court's emergency order placing Noah in DCS custody on September 19, 2018, stated that there was a "danger of immediate harm to Noah A[.] in the event that he would remain in the custody of [the paternal grandparents]." It is undisputed that Parents and Noah lived with the paternal grandparents since at least April 2018.[6] When the trial court entered the emergency order, the court was aware that Parents and Noah continued to reside in the grandparents' home. Any reference in the trial court's order to removal from the grandparents' home is not material as it was also Parents' home at the time. Additionally, prior to the emergency order on September 19, 2018, there is no record of a court order that removed Noah from the *legal* custody of Parents. Therefore, we find Parents' argument on this point unavailing. There was an order that removed Noah "from the home or the physical or legal custody of" Parents that was entered after Noah was alleged to be dependent and neglected. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a) (2019).

Parents further argue that the efforts made by DCS to aid Parents in establishing a suitable home were not reasonable because their efforts to establish a suitable home

---

[6] In the Order Controlling Conduct and for Protective Supervision, the juvenile court ordered "[t]hat the parents have loosely supervised contact with the child and that the mother, father, and child, Noah A[.], remain in the home of the grandparents . . . while the mother and father are complying with services through DCS."

exceeded the efforts made by DCS. The trial court's findings on this ground show otherwise. The court found, and the evidence shows, that DCS made several efforts after Noah was placed in DCS custody to help Parents establish a suitable home. Specifically, it found that DCS held meetings with Parents, scheduled visits, conducted drug screens, scheduled parenting classes, maintained an open line of communication with Parents, provided transportation, and provided information on low income housing. When Father informed Ms. Clare that he had an outstanding utility bill that prevented him from obtaining a home, she provided him with information to assist him in paying the bill. Father testified that he did in fact receive $200.00 in assistance for the outstanding balance on this bill.

DCS also made efforts to prevent the removal of Noah from Parents' home. *See id.* § 36-1-102(1)(A)(ii)(b) (2019). Prior to Noah's removal on September 19, 2018, DCS helped coordinate assessments for Parents to complete; referred Parents to WestCare in May 2018; and helped develop Parents' initial permanency plan. Despite DCS's efforts prior to Noah's removal, Parents continued to test positive for illegal substances and would care for Noah while under the influence.

In contrast to the efforts made by DCS, Parents made very minimal efforts to establish a suitable home. They waited several months to complete their required alcohol and drug and mental health assessments and only did so after being incarcerated; they did not provide a transportation plan or obtain a means of transportation; and they continued to either not submit to drug screens or test positive for illegal substances. Rather than obtain an income, Father admitted that he did not seek employment prior to April 2019 "[b]ecause [he] was just lazy" despite knowing that Noah was in the custody of DCS. Similarly, the maternal grandmother testified that Mother does not generate an income. Parents did not consistently attend scheduled visits. Just a few weeks prior to trial, Parents tested positive for unprescribed medications. Despite Father's most recent efforts to generate an income, when the maternal grandparents move from their current residence, Father admitted that he and Mother will not have a residence.

Based on the foregoing, we agree with the trial court that the efforts made by DCS to assist Parents in obtaining suitable housing have greatly exceeded their own. We find that there is clear and convincing evidence to show that Parents did not make reasonable efforts to provide Noah with a proper home that is free of drugs. It is clear that Parents' actions in the months following Noah's removal demonstrate a lack of concern for the welfare of Noah such that it is unlikely that they will be able to provide a suitable home at an early date. *See In re Aaralyn O.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246, at *7 (Tenn. Ct. App. Jan. 18, 2018) (holding a parent's continued drug use shows the parent is "either unable or unwilling to maintain a safe and stable home"). As such, we affirm the trial court's finding that DCS has proven this ground for termination of Parents' parental rights.

## 2. Abandonment by Incarcerated Parent

Tennessee Code Annotated section 36-1-102(1)(A)(iv) states that, in parental termination cases, abandonment can also occur by an incarcerated parent. *See In re K.F.R.T.*, 493 S.W.3d 55, 59 (Tenn. Ct. App. 2016). At the time the petition for termination was filed in this case, Section 36-1-102(1)(A)(iv) stated, in pertinent part, that abandonment by an incarcerated parent has occurred when:

> the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and *either* has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, *or* the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). Here, the trial court found abandonment by wanton disregard and abandonment by failure to visit. *See In re Audrey S.*, 182 S.W.3d at 865 (stating that subsection (iv) contains "two distinct tests for abandonment").

Again, the petition to terminate was filed on April 2, 2019. It is undisputed that Parents were both incarcerated for probation violations from March 9, 2019, through the beginning of April 2019. Meaning, Parents were incarcerated during part of the four months immediately preceding the filing of the petition. However, Parents assert that the trial court failed to make specific findings of fact to support this ground.

### a. Wanton Disregard

A parent's incarceration is not the lone requirement for this ground. *See In re Audrey S.*, 182 S.W.3d at 866. Instead, it serves "as a triggering mechanism" for a court to "determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id*. "When considering whether a parent's criminal conduct constitutes wanton disregard, we consider 'the severity and frequency of the criminal acts.'" *In re Johnathan M.*, 591 S.W.3d 546, 555 (Tenn. Ct. App. 2019) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). Previously, we have "held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.

In its final order, the trial court specifically found that prior to Parents' incarceration in March 2019, they continued to test positive for illegal substances or, as Ms. Clare

testified, they were non-compliant with drug treatment. The trial court noted that a positive drug test "was the basis of [Father's] arrest for a violation of probation." Additionally, the court found that despite the extensive efforts made by DCS to aid Parents, they failed to complete the action steps in their permanency plan, their services at WestCare were terminated for noncompliance, they failed to maintain regular visitation with the child, and they ceased communication with DCS prior to their incarceration. It found that Parents chose to "abandon communication with DCS knowing their child was in DCS custody." Ms. Clare's testimony supports these findings. Therefore, we find no merit in Parents' argument that the court failed to make sufficient findings on this ground.

We agree with the trial court that during the time when Parents were *not* incarcerated, their actions show that they were not concerned with the welfare of Noah. As a result, we find that Parents abandoned Noah under section 36-1-102(1)(A)(iv) by engaging in conduct that exhibited a wanton disregard for his welfare.

### b. Failure to Visit

The trial court also found that abandonment by an incarcerated parent was proven as a ground due to Parents failing to visit during the four months prior to their incarceration. However, this ground was not properly plead or tried by implied consent, so it is not an appropriate ground for termination.

In the petition to terminate Parents' parental rights, DCS listed "abandonment by incarcerated parent" and listed section 36-1-102(1)(A)(iv) as the second alleged ground for termination. Again, subsection (iv) contains "two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. The "first test" is whether the parent has failed to visit or failed to support the child during the requisite four-month period. *Id.* (quoting Tenn. Code Ann. § 36-1-102(1)(A)(iv)). "The second test asks whether the parent 'has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.'" *Id.* (quoting Tenn. Code Ann § 36-1-102(1)(A)(iv)). Ensuring that each ground alleged was properly pled is a critical issue in termination cases. As we have previously stated:

> courts must "strictly apply the procedural requirements in cases involving the termination of parental rights." Providing notice of the issues to be tried is considered a fundamental component of due process. The pleadings limit the ruling to the grounds of termination alleged, "because to find otherwise would place the parent at a disadvantage in preparing a defense." Thus, a trial court cannot terminate parental rights based on a ground that is not alleged in the complaint.

*In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *4 (Tenn. Ct. App. Jan. 11, 2012) (citations omitted).

In this case, we cannot say that DCS properly pled abandonment by an incarcerated parent due to failure to visit under section 36-1-102(1)(A)(iv). Although the petition appropriately lists subsection (iv) as the definition of abandonment alleged, that section of the petition is devoid of any mention of Parents visiting Noah during the requisite four-month period. Under the alleged abandonment by incarcerated parent ground, the petition does not list failure to visit as a reason why the ground applies. Further, the same portion of the petition does not give any alleged facts that pertain to Parents' visitations, or lack thereof. Given the importance of properly pleading grounds for termination, we conclude that abandonment by an incarcerated parent for failure to visit under section 36-1-102(1)(A)(iv) was not properly pled. *See In re Johnny K.F.*, No. E2012-02700-COA-R3-PT, 2013 WL 4679269, at *1-2, *7 (Tenn. Ct. App. Aug. 27, 2013) (holding the father was not given sufficient notice of alleging abandonment by wanton disregard when the petitioners pled subsection (i) but not subsection (iv)); *In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, at *3-4 (Tenn. Ct. App. Feb. 8, 2013); *In re Landon H.*, 2012 WL 113659, at *6 (holding the petitioners' pleadings that alleged persistence of conditions and failure to support were insufficient to provide notice of alleging abandonment by wanton disregard for the child's welfare).

Although we have found that DCS did not properly plead abandonment by incarcerated parent for failure to visit, "a ground for termination not included in the petition properly can be found if the ground was tried by implied consent." *In re Eimile A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at *5 (Tenn. Ct. App. Dec. 26, 2013) (quoting *In re Anthony R.*, 2013 WL 500829, at *4 n.5). In determining whether a ground was tried by implied consent, it must be clear "that the parent fully understood that this particular upheld ground for termination was being tried and that the parent impliedly consented to the trial of that ground even though it had not been pled." *In re Johnny K.F.*, 2013 WL 4679269, at *8. Additionally, it must be clear that "the evidence presented relevant to the unpled ground had *no relevance to any other issue* being presented to the [t]rial [c]ourt." *In re Eimile A.M.*, 2013 WL 6844096, at *5 (emphasis added). In reviewing the record, we cannot say that Parents "fully understood" this ground was being tried by implied consent, *In re Johnny K.F.*, 2013 WL 4679269, at *8, nor can we say evidence on this ground "had no relevance to any other issue." *In re Eimile A.M.*, 2013 WL 6844096, at *5.

During opening statements at trial, none of the attorneys for Parents or DCS mentioned failure to visit as a possible issue under the alleged abandonment by incarcerated parent ground. In comparison, upon closing, counsel for Mother and counsel for Father each mentioned Parents' failure to provide support. Father's attorney also mentioned wanton disregard as an alleged reason for abandonment by incarcerated parent. Despite these statements, much like the petition, there was no mention of failure to visit that would indicate Parents fully understood the issue was to be tried. There was evidence presented that was relevant to Parents' alleged failure to visit. However, such evidence was also

certainly relevant to other issues before the court, including the ground of substantial noncompliance with the permanency plan and the best interest analysis. *See, e.g.*, *In re Eimile A.M.*, 2013 WL 6844096, at *5 (stating "the evidence relevant to wanton disregard also was relevant to the ground of persistent conditions, which was properly pled"); *In re Landon H.*, 2012 WL 113659, at *6 (holding abandonment by wanton disregard was not tried by implied consent, in part, because it was relevant to the best interest analysis). In the absence of evidence that indicates that Parents fully understood failure to visit was being tried by implied consent and because evidence relevant to their failure to visit was relevant to other issues, we conclude that this ground was not tried by implied consent. As a result, we cannot consider it as a ground for termination in this case. *See In re Eimile A.M.*, 2013 WL 6844096, at *5; *In re Landon H.*, 2012 WL 113659, at *6.

Based on our findings, we vacate the trial court's finding that DCS established abandonment by incarcerated parent for failure to visit.

### 3. Substantial Noncompliance with the Permanency Plan

Another potential ground for termination is "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2) (2019). The Tennessee Supreme Court has observed:

> A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan . . . so long as the plan requirements are "reasonable and related to remedying the conditions which necessitate[d] foster care placement." Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and "going through the motions" does not constitute substantial compliance.

*In re Carrington H.*, 483 S.W.3d at 537 (alteration in original) (citations omitted) (quoting *In re Valentine*, 79 S.W.3d 539, 547(Tenn. 2002)). Whether there has been substantial noncompliance with a permanency plan is a question of law, reviewed on appeal *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548. The parent's noncompliance must be "substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548-59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

Again, Parents argue that the trial court did not make explicit findings on Parents' responsibilities under the permanency plan and on whether they were reasonable and related to remedying the conditions which necessitate foster care. However, the absence

- 13 -

of such a finding by a trial court is not fatal to this court reviewing the issue *de novo*. *See In re Valentine*, 79 S.W.3d at 547.

In this case, a primary concern that necessitated Noah entering DCS custody was Parents' continued drug abuse. Ms. Clare testified that DCS was also concerned with the safety and environment of Parents' home at the time Noah left their custody. Under the permanency plan that was developed by the parties and ratified by the trial court, Parents' responsibilities included: (1) complete a new alcohol and drug assessment and follow the recommendations of the provider; (2) submit to random drug screens and pill counts; (3) to complete a new mental health assessment and follow any recommendations; (4) obtain and maintain housing for at least three months; (5) obtain a legal source of income to care for Noah's basic needs; (6) continue parenting education; (7) provide a transportation plan or means of transportation; (8) comply with all rules of probation and not obtain new legal charges; and (9) visit Noah twice per month. Considering the primary concerns that led to Noah leaving Parents' care were their drug use and inability to provide a safe and stable home, we find these requirements were reasonable and related to remedying the conditions that led to foster care placement in this case.

Having determined that the requirements of the permanency plan are reasonable, we now consider whether Parents were in substantial compliance with the plan. With respect to this ground, the trial court credited Ms. Clare's testimony on Parents' lack of progress. In particular, it found that Ms. Clare testified that Parents were not compliant because they continued to fail drug screens, had services terminated for noncompliance, failed to complete IOP, failed to resolve legal issues, and violated the terms of their probation for failing drug screens. Most recently, Parents tested positive for unprescribed substances on June 28, 2019. Further, the trial court found that Parents did not visit Noah twice per month as the plan required, and they did not obtain and maintain appropriate housing or transportation. The evidence shows that Parents consistently missed scheduled visits, even prior to their incarceration.

Many of Parents' efforts to complete the requirements of the plan did not take place until after or just before the petition for termination was filed. Father completed his alcohol and drug and mental health assessments while he was incarcerated—just prior to the petition being filed. However, he admitted that he had completed only a small portion of the recommended IOP at the time of the final hearing. Father admitted that he did not seek employment or start generating an income until after the petition was filed because prior to that point, "[h]e was just lazy." Still, even after he began generating a small income, Father did not begin providing support for Noah until "May or June" 2019. Father claims that at that time he began paying $18.00 per week in child support. However, none of his earnings went towards paying off overdue bills that prevented him from providing housing for Noah.

As for Mother's progress, Ms. Clare testified that she did not begin her IOP until

- 14 -

late June 2019. Additionally, Mother waited several months to complete the required assessments. Both of Parents' transportation plans were relying on the maternal grandparents for transportation, who were planning on moving in the near future.

While Parents made some progress on their requirements *after* DCS filed the petition to terminate their parental rights, their progress has been minimal. The most critical concern was their drug abuse, which has not been sufficiently addressed. Regarding such post-petition efforts by parents, this Court has stated "that a parent's efforts to comply with a permanency plan after the filing of a petition to terminate can be 'too little, too late.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *6 (Tenn. Ct. App. Apr. 4, 2018). Likewise, we find that Parents' actions in this instance are "too little, too late." Despite the efforts made by DCS to assist their progress, Parents' noncompliance with the permanency plan requirements was far more than "[t]rivial, minor, or technical deviations." *See In re M.J.B.*, 140 S.W.3d at 656. Their noncompliance was substantial. *See Id.* Parents were aware of the requirements and understood the gravity of not complying with those requirements. Approximately a month after Noah was removed from their custody, Parents reviewed and received copies of the criteria for terminating their parental rights.

In sum, we conclude that the record clearly and convincingly establishes Parents' substantial noncompliance with the permanency plan, and therefore, we affirm the termination of their parental rights on this ground.

### 4. Failure to Remedy Persistent Conditions

Parental rights may be terminated on the basis of "persistence of conditions," as defined by Tennessee Code Annotated section 36-1-113(g)(3)(A), when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

To terminate parental rights on this ground, a petitioner must prove all three elements by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. The six-month period under subsection (g)(3) "must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B) (2019).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d at 605 (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). When continued efforts that were made to "help to improve the parenting abilities . . . have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). In determining whether a "condition persists," courts consider the conditions that led to the child's removal from the parent's custody and any other conditions that are likely to cause the child to be subject to future abuse and neglect. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i); *In re Audrey S.*, 182 S.W.3d at 872.

Parents again argue that this ground is inapplicable because there was no court order removing Noah from their home or physical or legal custody. We addressed and rejected this argument in our discussion of the first ground listed. For the same reasons that are stated above, we reject this argument as it pertains to this ground.

On September 19, 2018, Noah was removed from Parents' custody due to their substance abuse and their inability to provide a suitable home. On October 23, 2018, the trial court adjudicated Noah as dependent and neglected. As we have previously stated, the conditions that led to his removal persist. As recently as June 28, 2019, just thirteen days prior to trial, Parents tested positive for unprescribed substances. This was not a standalone incident. On February 21, 2019, Mother tested positive for Suboxone and Father admitted to using the same just a few days earlier. As for their living situation, Father admitted that after the maternal grandparents move to another county, he and Mother will no longer have a place to live. Without even a prospect of where they will reside, at the time of trial, Parents had still not provided a suitable home for Noah. Therefore, other conditions persist that are likely to cause Noah further abuse or neglect.

At the time of trial, neither parent had made significant progress on their IOP classes. Additionally, for the majority of Noah's time in DCS custody, Parents did not provide financial support for Noah or obtain appropriate housing. Parents' purported transportation plans consisted of them relying on the grandparents that were planning to

- 16 -

move to another county. These conditions, as well as Parents' continued substance abuse and inability to provide a suitable home, persist and are likely to cause Noah further neglect. Considering Parents' lack of progress in remedying these conditions, it is unlikely that the conditions will be remedied at an early date. As a result, it is unlikely that Noah can be safely returned to Parents' custody in the near future.

As for the third element of this ground, Ms. Clare testified to Noah's relationship and progress in his foster home. Ms. Clare stated that Noah refers to his foster parents as "mom" and "dad" and looks for the foster mother at the end of visits with Mother. Ms. Clare also testified that since Noah entered DCS custody, he has not exhibited any behavioral issues in the foster home. In contrast, Parents have not provided a stable home or visited Noah on a consistent basis. As such, we find that the continuation of Noah's relationship with Parents greatly diminishes his chances of integrating into a safe, stable, and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).

Based on the foregoing, we agree with the trial court that DCS has established the ground of persistence of conditions by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(g)(3).

### 5. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides that a parent's rights may be terminated when:

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

To succeed in terminating parental rights under this ground, the petitioner must prove two elements by clear and convincing evidence. First, the petitioner must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14); *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018). Second, it must prove that placing the child in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14); *In re Keilyn O.*, 2018 WL 3208151, at *8.

Since this ground was added to subsection (g) in 2016, a split of authority has developed regarding the proof required to establish the "ability and willingness" prong of the analysis. Certain panels of this Court have followed the decision in *In re Amynn K.*,

No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12-15 (Tenn. Ct. App. June 20, 2018). *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018). Under the *In re Amynn K.* approach, the petitioner must prove "that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child *or* has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." *In re Amynn K.*, 2018 WL 3058280, at *14. Other panels apply the approach stated in *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). *In re Ayden S.* states that a petitioner must prove that a parent failed to manifest *both* an ability *and* a willingness to assume custody or financial responsibility of the child. *In re Colton B.*, 2018 WL 5415921, at *9; *In re Ayden S.*, 2018 WL 2447044, at *7. Under this interpretation, if a party proves only the "ability" criterion or the "willingness" criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights. However, "where the parent has manifested neither a willingness nor an ability to assume custody and responsibility," the split of authority is not relevant and termination of parental rights may be upheld under either approach. *In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *8 (Tenn. Ct. App. Oct. 23, 2019) (citing *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019); *In re Colton B.*, 2018 WL 5415921, at *9-10).[7]

When evaluating a parent's ability, we focus "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). "When evaluating willingness, we look for more than mere words." *Id.*; *see also In re Amynn K.*, 2018 WL 3058280, at *15 (stating "[a parent's] actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to [his] actual willingness to assume custody or financial responsibility for the Child"). Rather, a parent must have demonstrated willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Zaylee W.*, 2020 WL 1808614, at *5.

Based on the facts of this case, we find that Parents have not manifested an ability or willingness to assume custody and responsibility of Noah, so there is no need to address the "split" of authority. The trial court found that Parents continue to have substance abuse issues, were on probation at the time of trial, have not completed IOP treatment, and do not have a suitable home for Noah. As a result, it found that placing Noah back in the custody of Parents poses a substantial risk of harm to Noah.

---

[7] In *In re Neveah M.*, a panel of this Court applied the approach stated in *In re Ayden S. In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *16 (Tenn. Ct. App. Mar. 4, 2020). On June 15, 2020, the Supreme Court granted an appeal in *In re Neveah M.* As of the filing of this Opinion, the Supreme Court has not yet rendered an opinion in that case.

- 18 -

Father argues that he has manifested an ability and willingness to assume custody because, after his release from jail, he made progress towards completion of the requirements in the permanency plan. He testified that he obtained a job and began paying child support in "May or June" 2019, one to two months before trial. In his brief, Father noted that "[t]he trial court further found that the remaining requirements for the father to complete were drug treatment, passing drug tests, and obtaining suitable housing and transportation."

In Mother's brief, she argues that she maintained stable housing at the home of the maternal grandparents, that she had provided a suitable transportation plan, and that she attempted to apply for a job and eventually applied for disability.[8] Further, Mother argues, she completed a mental health assessment and an alcohol and drug assessment. Mother completed those assessments only after the termination petition was filed, and she did not enroll in IOP treatment until June 24, 2019, less than a month before trial.

Based on the proof in this case, we cannot say that Parents' actions have displayed a willingness or ability to assume custody or responsibility of Noah. We cannot agree that Mother has established "stable" housing. The testimony at trial was that neither parent had a plan for housing after the maternal grandparents' impending move. Further, Parents continue to violate their terms of probation by consuming illegal substances. They have provided very little financial support for Noah since he left their custody. In February 2019, Parents only visited Noah once, and they missed both of their scheduled visits in January 2019 and December 2018. These missed visitations took place prior to Parents being incarcerated in March 2019. The progress that Parents have made in completing the requirements of the permanency plan is slight compared to the plan's overall scope. Considering the actions of Parents rather than their "mere words," *see In re Zaylee W.*, 2020 WL 1808614, at *5, we find that neither parent has manifested an ability or a willingness to assume custody or responsibility of Noah. While Parents state that they are willing to assume custody, their overall conduct has shown otherwise. Based upon these findings, we find that DCS has proven the first prong in section 36-1-113(g)(14) by clear and convincing evidence. *See In re Colton B.*, 2018 WL 5415921, at *9; *In re Keilyn O.*, 2018 WL 3208151, at *8.

Turning our focus to the second prong of (g)(14), we also find that placing Noah in Parents' custody would pose a risk of substantial harm to his welfare. Parents have not shown an ability to consistently provide necessities or a safe and proper home for Noah. Further, Ms. Clare's testimony shows that Noah has developed a bond with his foster parents. Therefore, we find that DCS has also proven the second prong of section 36-1-

---

[8] There is little evidence in the record regarding Mother's ability to work. At trial, the maternal grandmother testified that Mother "[has] never been able to work." However, she later said that she does not think that a doctor ever informed Mother that she cannot work.

113(g)(14) by clear and convincing evidence. *See In re Colton B.*, 2018 WL 5415921, at *9; *In re Keilyn O.*, 2018 WL 3208151, at *8.

In sum, DCS has properly established both requirements of Tennessee Code Annotated section 36-1-113(g)(14). Therefore, we affirm the trial court's holding that this ground is an appropriate ground to terminate Parents' parental rights.

## B.    Best Interest Determination

Once a ground for termination has been proven by clear and convincing evidence, the court must determine whether it is in the best interest of the child to terminate the parent's parental rights. *In re Valentine*, 79 S.W.3d at 546. Tennessee Code Annotated section 36-1-113(i) lists non-exhaustive factors for a court to consider when determining the child's best interest.[9] *In re Carrington H.*, 483 S.W.3d at 523; *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006). The Tennessee Supreme Court has explained:

> Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear

---

[9] The factors listed in Tennessee Code Annotated section 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

and convincing evidence that termination is in the child's best interest[s]. When considering these statutory factors, courts must remember that [t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (alterations in original) (citations and quotation marks omitted).

As we have previously discussed, Parents have unresolved drug issues and have not established suitable housing for Noah. These issues are the same issues that caused Noah to be placed in DCS custody. Parents' unresolved issues have continued despite the efforts made by DCS to help improve their circumstances. Since Noah left Parents' custody, DCS has provided support for Parents by scheduling appointments for mental health assessments, drug and alcohol assessments, and visitations; by arranging transportation services; by scheduling parenting classes; by providing information on low income housing; and by providing information on how to gain assistance on the overdue utility bill. Despite DCS's efforts, Parents have not sustained efforts to adjust the circumstances of their lives. Therefore, factors (1) and (2) weigh in favor of terminating Parents' parental rights.

Regarding factor (3), Parents did not maintain regular visitation with Noah. Ms. Clare testified that during the first four months Noah was in DCS custody, Parents attended only four of the seven scheduled visitations. In December 2018 and January 2019, they did not attend any visitations. Factor (3) weighs in favor of terminating Parents' parental rights.

The trial court stated that "[i]t appears to this [c]ourt, based on all testimony, that a meaningful relationship between [P]arents and [Noah] does exist." While the testimony on this issue was not extensive, the evidence does not preponderate against this finding. Ms. Clare stated that when visitations do occur, Noah is happy to see Parents and the time spent together is positive. Factor (4) weighs against terminating Parents' parental rights.

Ms. Clare testified that Noah has developed a bond with his foster parents, who he calls "mom" and "dad." She also testified that he has not had any issues or behavioral concerns since entering the foster home. This testimony stands in contrast to Parents' ongoing drug use, lack of support, and lack of a suitable home. Shortly after Noah entered DCS custody, Ms. Clare reported that he exhibited developmental and speech delays. However, after spending several months in foster care, Noah showed improvement in these areas. As such, factor (5) weighs in favor of terminating Parents' parental rights.

There is no proof that Parents physically or psychologically harmed Noah. Factor (6), therefore, weighs against terminating Parents' parental rights.

As we have discussed at length, Parents have failed to establish a suitable home for Noah. Father confirmed this issue when he stated Parents will have no home once the maternal grandparents move. Additionally, Parents' ongoing use of controlled substances is likely to render them unable to care for Noah in a suitable manner. Factor (7) weighs in favor of terminating Parents' parental rights.

There is insufficient proof to make a finding on factor (8).[10]

Mother has not provided any financial support since Noah entered DCS custody. Father has paid minimal support, but he only began doing so several weeks prior to trial. Rather than using his income to help provide Noah with necessitates or to pay for a suitable home, Father admitted to spending money on cigarettes and on gifts for Mother's other children. Factor (9) also weighs in favor of terminating Parents' parental rights.

In viewing the evidence from Noah's perspective, we conclude that DCS has presented clear and convincing evidence that shows terminating Parents' parental rights is in Noah's best interest.

## V. CONCLUSION

For the foregoing reasons, we vacate the trial court's finding of abandonment by incarcerated parent for Parents' alleged failure to visit. We affirm the trial court's holding that the evidence clearly and convincingly establishes the other grounds for termination of the parental rights of both Mother and Father. We also affirm the holding that termination of their parental rights is in Noah's best interest. Accordingly, we affirm the decision to terminate the parental rights of both Mother and Father.

This case is remanded to the juvenile court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed equally to the appellants, Kevin M. and Amanda A., for which execution may issue, if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

[10] A finding on each statutory factor is not required for a court to make a best interest determination under section 36-1-113(i). *In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).